## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SWISSWATCHEXPO, INC.,

a Georgia corporation

   *Plaintiff,*

    v.

BUYER'S BEST BET, INC. d/b/a
EBESTMEDIA, a Georgia corporation
and LENNY ESTRIN, an individual

  *Defendants.*

**DEMAND FOR JURY TRIAL**

Case No.:

---

## COMPLAINT

Plaintiff SwissWatchExpo, Inc. ("SWE") brings this action in equity for an accounting and for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, that SWE is not infringing on the copyrights of Defendants Buyer's Best Bet, Inc. d/b/a eBestMedia ("eBestMedia") and Lenny Estrin (collectively the "Defendants"), for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that SWE has a perpetual paid-up implied license to any copyrights which may be owned by Defendants relating to the SWE website, and further alleging and seeking damages for claims of (1) breach of contract; (2) breach of implied warranty for fitness; (3)

breach of implied covenant of good faith and fair dealing; (4) tortious interferences with business relations; (5) libel; (6) violation of the Georgia Uniform Deceptive Trade Practices Act; (7) fraud; (8) punitive damages; and (9) attorney's fees.

## NATURE OF THIS ACTION

1.     This is a civil action in which SWE seeks declaratory judgment as well as preliminary and permanent injunctive relief, and other necessary and proper relief, enjoining Defendants from contacting SWE, its partners, associates, customers, and other entities engaged by SWE, alleging that SWE has infringed on eBestMedia's copyrights in SWE's website.

2.     Defendants claim to have exclusive rights in an e-commerce platform including, backend, administrative, and frontend source code, object code, and other allegedly copyrighted works such as frontend web pages, designs, HTML, CSS, XML, and computer screen displays (the "Alleged Works"). Defendants also claim that SWE's new website (the "New Website") infringes on the Alleged Works.

3.     In furtherance of these claims, Defendants sent a demand letter to the Plaintiff on July 20, 2020 (the "Demand Letter") demanding that SWE "immediately cease and desist from production, reproduction, publishing, provision, distribution, transmission, display, and use of materials that infringe on eBestMedia's works."

4.     Despite specific requests, the Defendants have not identified any copyright registrations or even copyright applications relevant to their claims or specifically identified any of the software code, HTML, CSS, or XML or any specific content on SWE's New Website that is allegedly infringing the Alleged Works.

5.     In order to resolve this pressing controversy and threat to SWE's continuing business operations, SWE seeks a declaratory judgment that SWE has not infringed on any of Defendants' alleged copyrights in the Alleged Works or alternatively and that SWE has a perpetual paid-up implied license to any copyrights which may be owned by Defendants relating to the New Website, and further to enjoin the Defendants from disparaging SWE to its partners, customers, and associates, and from continuing to interfere with any of SWE's business relationships.

## **PARTIES**

6.     SWE is a corporation organized and existing pursuant to the laws of the State of Georgia, with its principal place of business at 3170 Peachtree Road, Atlanta, Georgia 30305.

7.     Defendant eBestMedia is a corporation organized and existing pursuant to the laws of the State of Georgia, with its principal place of business 6825 Weatherstone Way, Alpharetta, Georgia 30009.

8.     Defendant Lenny Estrin ("Mr. Estrin"), an individual, is the CEO and CFO of eBestMedia. Upon information and belief, this Defendant resides in the State of Georgia at 6825 Weatherstone Way, Alpharetta, Georgia, 30009.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*; Article I, § 8, cl. 8 of the U.S. Constitution); and § 1338 (exclusive original jurisdiction over claims arising under the Copyright Act). This Court has supplemental jurisdiction over Plaintiff's state law claims based on 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over the Defendant eBestMedia because it systematically conducts its operations, and has availed itself of the privileges of conducting business, in the State of Georgia by offering and selling its coordination of website development and maintenance services to citizens of Georgia, including SWE.

11.    This Court has personal jurisdiction over Defendant Lenny Estrin because he resides and manages his business, eBestMedia, in the State of Georgia.

12.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District, including Defendants' negotiation, entry into, execution of, and termination of Defendants' contractual business arrangement with SWE.

13.    Venue is also proper under 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District, as alleged in Paragraphs 10 and 11 of this Complaint.

## FACTUAL ALLEGATIONS

14.    SWE is a high-end watch dealer that acquires, authenticates, services, polishes, photographs, advertises through paid means, markets on social media, and sells authentic, pre-owned, luxury time pieces on its website and retail store. SWE's products are restored to the newest condition reasonably possible and then sold with a widely respected and coveted 18-month warranty.

15.    Based on representations by Defendants, eBestMedia is a coordinator between its clients and third-party, independent contractor website developers, programmers, SEO professionals, software coders, and server administrators

(collectively the "Third-Party Coders and Service Providers"), who offer website development, hosting, and maintenance services online.

16.     The Parties entered into an oral agreement in 2009 (the "Agreement") in which SWE hired Defendants to coordinate the website development services and payments of the various Third Party Coders and Service Providers for SWE's website originally located at the URL www.swisswatchexpo.com (the "Initial Website"). Defendants were responsible for ensuring that the Initial Website could be accessed on a variety of standard devices (including mobile devices) using various commercial browsers.

17.     Specifically, SWE developed the content of the website including the design, copy, and featured photographs while Defendants coordinated SWE's design concepts with the Third-Party Coders and Service Providers (the "Services").

18.     Upon information and belief, Mr. Estrin has little, if any, recent experience with software coding and advised SWE that neither he nor eBestMedia have or have had any employees who are software coders or developers. Accordingly, all coding and website development services were outsourced to the Third-Party Coders and Service Providers.

19.     At no time prior to 2020 did Defendants claim to own any copyrights in any of the materials, software, or code they coordinated and provided to SWE. To

the contrary, Defendants affixed a copyright notice to the Initial Website in the name of SWE.

20.    Defendants sent SWE invoices every month for their services including service fees from the Third-Party Coders and Service Providers and other vendors as Defendants' pass-through fees. The Parties agreed that such pass-through fees would represent the actual cost of any third-party services with no markups of any kind.

21.    Despite SWE's specific request, Defendants have not provided copies of any contracts with the Third-Party Coders and Service Providers relating to the code and other services for which Defendants paid and which were utilized on the Initial Website.

22.    Despite Defendants' repeated refusal to provide any contracts with the Third-Party Coders and Service Providers, let alone explanations for the work provided by the Third Party Coders and Service Providers, SWE timely paid all invoices from Defendants in reliance upon Defendants' continuing representations that all such charges were merely passed through from the Third-Party Coders and Service Providers without markup.

23.    The Defendants, in tandem with SWE, coordinated the development of the Initial Website, which included a copyright notice stating "2009-2020 ©

SwissWatchExpo.com. All rights reserved." affixed by Defendants. Screenshot captures of the Initial Website from January 28, 2011 and February 14, 2020 featuring the copyright notice acknowledging SWE's copyright are attached as Exhibit A.

24.    SWE reasonably concluded that Defendants had contracted with the Third-Party Coders and Service Providers for SWE to own the copyrights to the code provided.

25.    The Initial Website launched at the end of 2009.

26.    Immediately upon the launch of the Initial Website, the quality was dissatisfactory as it was riddled with repeated functionality issues including slow loading, crashing, and other functionality disruptions and software deficiencies (hereinafter detailed in part the "Software Deficiencies").

27.    Specifically, the mobile site was severely malfunctioning as the images could not render or load on mobile phones, it was down for hours or sometimes an entire day, and caused customers to complain about the slowness and leave quickly, which significantly affected SWE's sales because a substantial percentage of the Initial Website's traffic came from mobile users. In addition, the mobile site malfunctioning caused SWE's bounce rate to highly increase and SWE's conversion rate to be virtually non-existent.

28.     SWE lost countless customers and approximately $1,150,000 in profits due to the Software Deficiencies in the Initial Website.

29.     Due to the Software Deficiencies, often times a multitude of users would leave the Initial Website's mobile site so quickly, causing a severe reduction in SWE's Google organic ranking, resulting in SWE appearing lower and lower on Google searches.

30.     Additionally, Defendants did not adequately test, if at all, how the Initial Website looked and responded on multiple browsers, Defendants did not perform an audit of the source code as is normal practice, and Defendants kept the Initial Website on the same server as other companies, all of which also affected the quality of the Initial Website and contributed to the Software Deficiencies, which also caused a lower Google ranking.

31.     SWE spent $500 per day in advertising the Initial Website on Google and Bing Search Engines, however, these expenditures turned out to be virtually useless due to the Software Deficiencies.

32.     In addition to the Initial Website appearing lower in Google searches, Google also penalized SWE for Defendants' failure to password protect SWE's test website because Google considered the test website duplicate content. Google

penalized SWE by reducing its ranking, which also affected SWE's advertising costs, and its access organically.

33.     SWE timely notified the Defendants of the Software Deficiencies on numerous occasions, demanding that the deficiencies be corrected. Instead, Defendants' communications were extremely rude and unprofessional as they merely asserted that they were significantly underpaid and unilaterally raised their fees without SWE's agreement, without adding any services, and without fixing the Software Deficiencies. Additionally, each time SWE attempted to resolve the Software Deficiencies in good faith, Defendants refused to attend meetings to discuss the Software Deficiencies, made modifications to the Initial Website without permission or explanation, and subsequently sent invoices to SWE for the unwanted modifications. As a result, Defendants' actions held SWE's Initial Website hostage and prevented SWE from acting on critical initiatives or necessary modifications, which caused expensive operational delays.

34.     In July 2019, SWE hired another website developer, M16 Marketing, LLC ("M16"), to build the New Website as a backup plan to the Initial Website due to the continuous Software Deficiencies and the Defendants' failure to cure the Software Deficiencies.

35.    The Software Deficiencies in the Initial Website were so problematic, that SWE hired M16 to build the New Website from scratch as SWE decided not to use any part of the faulty code in the Initial Website because of concerns that the deficiencies would not all be removed and would plague the New Website going forward.

36.    In March 2020, SWE chose to discontinue using the Defendants' Services due to the rampant Software Deficiencies and other serious contractual breaches by Defendants.

37.    SWE requested the Initial Website's source code as a backup before the New Website launched, however, Defendants refused to provide access to the Initial Website's source code. This refusal to provide any access to the underlying code held SWE and its business hostage.

38.    Accordingly, SWE never had access to the Initial Website's source code or equipment. Thus, M16 also never had access to the Initial Website's source code or equipment over the course of the following nine months prior to launch of the New Website.

39.    The New Website launched on April 5, 2020 at the URL www.swisswatchexpo.com in replacement of the Initial Website, which was taken down.

40.     On July 20, 2020, Defendants, through their counsel, sent SWE the Demand Letter asserting copyright infringement of the Alleged Works. A copy of the Demand Letter is attached as Exhibit B.

41.     The Demand Letter claims that the New Website is using the Alleged Works without the Defendants' permission.

42.     In a good faith attempt to resolve the claims, SWE responded to the Demand Letter on July 24, 2020, asking for more information supporting the infringement claims, specifically requesting copies of the relevant copyright registrations, copies of the Alleged Works, and references to SWE's New Website and code that the Defendants believe is infringing, so that SWE could properly evaluate and substantively respond to the Defendants' claims. A copy of this response to the Demand Letter is attached as Exhibit C.

43.     Additionally, in subsequent telephone conversations between Ms. Marcy Sperry (Plaintiff's counsel) and Mr. Ajit Dang (eBestMedia's counsel), Ms. Sperry advised Mr. Dang that Plaintiff had sought this information and needed it to evaluate the claims but neither Mr. Ajit nor eBestMedia would provide the information. Mr. Ajit did state that he would consult with his client regarding the requests for at least copies of the alleged copyright registrations, however, none have been provided as of the date of this filing.

44.    On August 28, 2020 SWE sent a follow-up response to the Demand Letter reiterating its prior written and oral requests. A copy of the follow-up response to the Demand Letter is attached as Exhibit D.

45.    To date, eBestMedia has not responded to SWE's information requests.

46.    Instead, upon information and belief, Defendants have engaged in a calculated attempt to coerce SWE to pay a monetary settlement by sending demand letters alleging infringement against SWE's business partners. Specifically, Defendants sent demand letters to SWE's Google advertising partner, Gillissa Limited ("Gillissa") and M16 alleging copyright infringement and demanding that they each cease and desist from using any of the Alleged Works on the New Website (collectively, the "Third-Party Demand Letters"). A copy of the Third-Party Demand Letter to Gillissa is attached as Exhibit E. A copy of the Third-Party Demand Letter to M16 is attached as Exhibit F.

47.    As a result of the Third-Party Demand Letters, both Gillissa and M16 terminated their relationships with SWE.

48.    As a result of the Third-Party Demand Letters, SWE had to hire a new website developer.

49.    Additionally, in their communications with SWE via email, Gillissa also conveyed to SWE that the price listed for Gillissa's "CSE extract" services on

the Defendants' previous invoices should have been $200 a month, much lower than the $300 amount listed on Defendants' invoices. A copy of the Defendants' invoices is attached as Exhibit G. A copy of the email from Gillissa is attached as Exhibit H.

50.    Defendants also filed a complaint against SWE under Microsoft Azure's takedown procedure for a Digital Millennium Copyright Act (DMCA) Violation.

51.    SWE received a notice of the complaint from Microsoft Azure on August 8, 2020 (the "Notice") in which the Defendants allege copyright infringement of the Alleged Works in the New Website and threatened removal of the New Website if Microsoft did not receive a response within 48 hours. A copy of the Notice is attached as Exhibit I.

52.    Defendants did not provide SWE with independent notice of this DMCA Notice prior to or contemporaneous with its filing.

53.    On August 10, 2020, SWE submitted a counter notice disputing the copyright infringement allegations in accordance with DMCA counter notice requirements under 17 U.S.C. § 512(g)(3) (the "Counter Notice").  A copy of the Counter Notice is attached as Exhibit J.

54.    Without responding to any of SWE's good faith attempts to collect supporting information regarding the validity of Defendants' copyright claims,

Defendants continue to threaten SWE with litigation to enforce their alleged copyrights unless SWE immediately ceases to use the New Website and pays Defendants a monetary amount.

**COUNT I**
**DECLARATORY JUDGMENT FOR**
**NON-LIABILITY OF COPYRIGHT INFRINGEMENT AND/OR**
**THE EXISTENCE OF A PAID-UP IMPLIED LICENSE**
**Under 28 U.S.C. §§ 2201 and 2202**

55.     SWE incorporates by reference the allegations of Paragraphs 1 through 54 of this Complaint.

56.     Defendants asserted in the Demand Letter that they are entitled to certain exclusive rights in the Alleged Works on the New Website and demanded that SWE comply with its assertion of exclusive rights without specifically identifying which portions of the New Website allegedly infringe on the Alleged Works.

57.     SWE faces the threat of imminent litigation by Defendants for SWE's continued use of the New Website and an inability to continue its prior business relationships until Defendants' threats are withdrawn or declared of no merit by the Court.

58.     Accordingly, an immediate and justiciable controversy exists because SWE disputes Defendants' copyright infringement claims.

59.     SWE could not have infringed on Defendants copyrights in the New Website because SWE had an implied license to use the Alleged Works in the Initial Website.

60.     The Parties never entered into a formal, written contract; rather, the Defendants merely coordinated the development of the Initial Website, including the Alleged Works, at the oral request of SWE and based on SWE's payment for the Website.

61.     The Defendants assisted with the launch of the Initial Website and acknowledged SWE's ownership of the Initial Website evidenced by the copyright notice at the bottom of the homepage stating "2009-2020 © SwissWatchExpo.com. All rights reserved." which was affixed by the Defendants.

62.     The Defendants were aware of SWE's intentions to own the Initial Website and to use the Alleged Works on the Initial Website.

63.     Defendants intended for SWE to use the Alleged Works in the Initial Website and had agreed to arrange for and pass through the costs of the Third-Party Coders and Service Providers for their website development services. Indeed, Defendants acted in accordance with those intentions from the inception of their relationship with SWE, except to the extent Defendants secretly inflated invoices from the Third-Party Coders and Service Providers and retained for themselves

proceeds paid by SWE to go to the Third-Party Coders and Service Providers on a pass-through basis.

64.     The Defendants' history and course of dealing with SWE leads to the conclusion that, at a minimum, the Defendants conducted themselves in a manner consistent with granting the Plaintiff a nonexclusive paid-up implied license to the code used in relation to the Initial Website.

65.     Without an implied license to the Alleged Works, the Initial Website would be worthless to SWE because the code and Initial Website were created precisely for SWE to use the Alleged Works to market and sell its products on the Initial Website.

66.     The Defendants continued to provide the Services regarding the Initial Website for almost ten years without objection to SWE's use of the Alleged Works in the Initial Website. At no time during these ten years did Defendants object to the consistent inclusion of a copyright notice, which was affixed by the Defendants at the bottom of the Initial Website expressly stating that SWE owned the copyright in the site.

67.     At the time Defendants performed the Services and coordinated the launch of the Initial Website including the Alleged Works, and at all times prior to

the termination of the Initial Website, the Defendants never limited the duration or scope of use of the Alleged Works.

68.     Upon information and belief, the Defendants cannot allege copyright infringement because Defendants do not own the copyrights in the Alleged Works.

69.     Upon information and belief, Mr. Estrin has little recent experience with software coding, outsourced all of the coding work to the Third-Party Coders and Service Providers, and neither reviewed any of the coding nor did the coding himself.

70.     Indeed, in 2013, Mr. Estrin entered the Initial Website to the WebAward Competition through its website www.WebAward.org where he introduced himself as a marketing manager and listed the following freelance coders as follows:

(1)     Optimization Manager: Igor Kolosov;

(2)     Lead Designer: Zoran Milovic

(3)     Lead Programmer: Emiliano Gonzalez;

(4)     System Support and Configuration: Drazen Petrek; and

(5)     Marketing Assistant: Beata Parun

71.     Upon information and belief, none of these Third-Party Coders and Service Providers are not employees of Defendants, but rather independent

contractors, and there is no written contract or copyright assignment from any of the Third-Party Coders and Service Providers assigning any of their copyrights in the outsourced codes to Defendants.

72.     Additionally, it is well established as an industry standard that when a website developer creates code for its client, there is no expectation of copyright ownership by the developer. *Holtzbrinck Publ. Holdings, L.P. v. Vyne Communs.*, 2000 WL 502860, at *7 (S.D.N.Y. Apr. 26, 2000) (holding that the defendant granted the plaintiff, at a minimum, a nonexclusive license in the programs and files created by defendant for the plaintiff's website when the plaintiff retained the defendant to develop and maintain a website for plaintiff's publication).

73.     Accordingly, this Court should grant a declaratory judgment that the Plaintiff is not infringing on the Defendants' alleged copyrights or the Alleged Works because of the reasons stated herein, including that the Plaintiff has an implied license and the Defendants do not own the copyrights to the Alleged Works.

## COUNT II
## BREACH OF CONTRACT
### Under O.C.G.A. § 13-6-10

74.     SWE incorporates by reference the allegations of Paragraphs 14-17 and 26-33 of this Complaint.

75.    In Georgia, the essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom. *Brooks v. Branch Banking & Trust Co.*, 107 F. Supp. 3d 1290 (N.D. Ga. 2015).

76.    The Parties entered into the Agreement in 2009 in which Defendants agreed to provide the Services for SWE's Initial Website in exchange for payment from SWE.

77.    When the Parties entered into the Agreement, the Defendants represented to SWE that they would be able to coordinate the launch and support highly functional software capabilities in the Initial Website, which would perform in accordance with its intended purpose.

78.    As such, coordination of delivery of highly functional software in the Initial Website was a material term of the Agreement. Defendants failed to perform the Services in a workmanlike manner and the product as delivered was not merchantable as it was unable to perform its functions as represented.

79.    From its launch, the Initial Website exhibited the Software Deficiencies.

80.    SWE timely and repeatedly notified the Defendants of the Initial Website's Software Deficiencies, however, the Defendants never cured the Software Deficiencies and instead deflected requests, made alternative changes or

modifications without permission or explanation, and frequently introduced new functionality issues. In addition, Defendants' communications were extremely rude and unprofessional as they merely asserted that they were significantly underpaid and unilaterally raised the fees charged by almost ten-fold, without SWE's agreement, without adding any new services, and without fixing the Software Deficiencies.

81.    As a result of the Initial Website's Software Deficiencies and Defendants' failure to cure such deficiencies, the Defendants failed to perform the Services they were contracted for in accordance with the Agreement, and thus breached the Agreement.

82.    Defendants' breach caused SWE to lose countless customers, over $1,150,000 in profits, which SWE expects to be confirmed and further defined by expert testimony.

**COUNT III**
**BREACH OF IMPLIED WARRANTY FOR FITNESS**
**Under O.C.G.A. § 11-2-315**

83.    SWE incorporates by reference the allegations of Paragraphs 14-17, 26-33, and 76-80 of this Complaint.

84.    In order to establish a warranty of fitness for a particular purpose, (1) the seller must have reason to know the buyer's purpose, and (2) the seller must

know the buyer is relying on the seller's skill or judgment to furnish the goods. *Mazza v. Atlas Roofing Corp. (In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.)*, MDL No. 2495 (N.D. Ga. June 8, 2018).

85.     An implied warranty of fitness existed because the Defendants knew that the purpose of the Agreement was to provide SWE with the Services and the Defendants also knew that SWE was relying on the Defendants' skill and judgment to coordinate the development of highly functional software capabilities in the Initial Website to market and sell authenticated pre-owned luxury watches, which could be quickly perused and directly purchased by customers visiting the Initial Website.

86.     The implied warranty of fitness was breached when the Initial Website immediately exhibited the Software Deficiencies, which then persisted from month to month and then year to year, which prevented the Initial Website from reasonably marketing or selling the authenticated pre-owned luxury watches in a manner that they could be quickly perused and purchased by customers visiting the Initial Website. The Defendants repeatedly and persistently failed to cure the Software Deficiencies after being notified by SWE on numerous occasions.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
## Under O.C.G.A. § 13-4-20

87. SWE incorporates by reference the allegations of Paragraphs 14-17, 26-33, and 76-80 of this Complaint.

88. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. *Tri-State Consumer Ins. Co. v. Lexisnexis Risk Solutions, Inc.*, 823 F. Supp. 2d 1306 (N.D. Ga. 2011).

89. The Agreement imposed on the Defendants the duty of good faith and fair dealing in its performance and enforcement.

90. The Defendants breached the covenant of good faith and fair dealing when the Defendants interfered with SWE's rights to receive benefits under the Agreement by failing to coordinate the development of the promised highly functional software capabilities in the Initial Website and failing to reasonably cure the Software Deficiencies in the Initial Website caused by poor workmanship, particularly with regard to integration of the software.

## COUNT V
## TORTIOUS INTERFERENCE WITH EXISTING
## CONTRACTUAL RELATIONS

91. SWE incorporates by reference the allegations of Paragraphs 46-48 and 50-53 of this Complaint.

92.     In establishing tortious interference with business relations, the plaintiff must prove (1) that the defendant acted improperly and without privilege; (2) interfered purposely with malice and with intent to injure; (3) induced a third party not to continue a business relationship with the plaintiff; and (4) the plaintiff suffered some financial injury. *Voice-Tel Enterprises, Inc. v. Joba, Inc.*, 258 F. Supp. 2d 1353 (N.D. Ga. 2003).

93.     When SWE terminated its business relationship with the Defendants, the Defendants acted improperly and without privilege by contacting M16 and Gillissa to falsely accuse SWE of copyright infringement of the Defendants' Alleged Works in the New Website.

94.     The Defendants purposely and maliciously interfered with SWE's business relations by sending the Third-Party Demand Letters to M16 and Gillissa to falsely accuse them and SWE of copyright infringement.

95.     The Defendants' Third-Party Demand Letters and false, unsubstantiated infringement claims induced M16 and Gillissa to discontinue their business relations with SWE.

96.     The Defendants' Third-Party Demand Letters caused injury to SWE because M16 and Gillissa terminated their relationship with SWE.

97.    As a result of its terminated business relationships with M16 and Gillissa, SWE suffered substantial financial injury. SWE was forced to hire a third website developer for the New Website. Further, as a result of the Third-Party Demand Letter to Gillissa, SWE had to take over responsibility of the Google product feed submissions, resulting in a substantial loss of time and money and institutional knowledge. The precise amounts will be proven by evidence in the case and the testimony of an expert.

98.    Accordingly, but for the Defendants' Third-Party Demand Letters containing false accusations of copyright infringement, SWE's relationships with M16 and Gillissa would have reasonably continued.

99.    Additionally, when SWE terminated its business relationship with the Defendants, the Defendants acted improperly and without privilege by contacting Microsoft Azure and filing the DMCA Notice using Microsoft's takedown procedure to falsely accuse SWE of copyright infringement of the Defendants' Alleged Works in the New Website.

100.   The Defendants purposely and maliciously interfered with SWE's business relations with Microsoft Azure by filing the Notice that falsely accused SWE of copyright infringement.

101.   The Defendants' Notice and false, unsubstantiated infringement claims induced Microsoft Azure to threaten to discontinue its business relations with SWE and immediately remove the New Website unless SWE responded with a counternotice within 48 hours.

102.   As a result of this Notice, the Defendants caused SWE substantial financial injury because SWE had to spend time and money on attorney's fees and costs to hire counsel to immediately draft and file the Counternotice to avoid the New Website from being taken down.

**COUNT VI**
**LIBEL**
**Under O.C.G.A. § 15-5-1**

103.   SWE incorporates by reference the allegations of Paragraphs 46-48 and 50-53 of this Complaint.

104.   Under Georgia law, libel is statutorily defined as the "false and malicious defamation of another expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule. *Stoploss Specialists, LLC v. Vericlaim, Inc.*, 340 F. Supp. 3d 1334 (N.D. Ga. 2018) (citing O.C.G.A. § 51-5-1(a)).

105.   To establish defamation, the essential elements are: (1) a false and defamatory statement concerning the person defamed; (2) an unprivileged

communication to a third party; (3) fault amounting at least to negligence; and (4) special harm. *Id*.

106.   The Defendants libeled SWE when they published false and defamatory statements in the Third-Party Demand Letters falsely accusing SWE of infringing on the copyright of the Defendants' Alleged Works in the New Website.

107.   The Defendants knew their statements in the Third Party Demand Letters regarding SWE's alleged copyright infringement were false because the Defendants knew SWE did not have access to the source code of the Alleged Works and thus could not have copied the source code.

108.   Alternatively, at a minimum, Defendants were negligent in believing that they have copyrights in the Alleged Works and that the Alleged Works were infringed by either SWE or Gillissa and M16.

109.   The Defendants statements in the Third Party Demand Letters and the DMCA Notice were false and defamatory because Defendants do not own the copyrights in the Alleged Works and because the SWE holds a valid implied non-exclusive, unlimited license in the Alleged Works.

110.   The Defendants' defamatory statements contained in the Third-Party Demand Letters harmed SWE's reputation and business relationships with M16 and

Gillissa, costing SWE significant damages. The amounts will be established by the evidence and the testimony of an expert.

111.    Additionally, the Defendants submitted the DMCA Notice to Microsoft Azure alleging that SWE's New Website was infringing on the copyrights in the Alleged Works.

112.    The Defendants' statements in the Notice regarding SWE's alleged copyright infringement were false and were intended to harm SWE by causing Microsoft Azure to take down the New Website if SWE did not immediately file its Counternotice.

113.    The Defendants' defamatory statements contained in the Notice harmed SWE because SWE had to spend time and money on attorney's fees and costs defending its website from being taken down.

## COUNT VII
## VIOLATION OF GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT O.C.G.A. § 10-7-372(a)

114.    SWE incorporates by reference the allegations of Paragraphs 14-17, 26-33, 76-80, 85-86, and 90 of this Complaint.

115.    Under Georgia statute, "a person engages in deceptive trade practice when, in the course of his business, he…(7) represents that goods or services are of

a particular standard, quality, or grade…if they are of another." O.C.G.A. § 10-7-372(a).

116.   When the Parties entered into the Agreement, the Defendants represented to SWE that they could and would provide high quality Services including the coordination of the development of the Initial Website with highly functioning software.

117.   The Defendants' misrepresentations regarding the characteristics and qualities of their Services induced SWE into hiring Defendants to coordinate the development of the Initial Website.

118.   Throughout the relationship Defendants reiterated these false statements and repeatedly influenced SWE to continue with the Defendants' Services based on false representations that the Software Deficiencies would be remedied and all glitches and substantial dysfunctional aspects of the code would be fully cured.

119.   As a result of hiring the Defendants due to their misrepresentations, and continuing the relationship with Defendants based on further false misrepresentations, SWE has suffered substantial financial injury due to the loss of countless customers and significant revenue due to the Software Deficiencies in the

Initial Website. The precise amount of this lost revenue will be established by the evidence and expert testimony.

### COUNT VIII
### FRAUD
### Under O.C.G.A. § 51-6-2

120.   SWE incorporates by reference the allegations of Paragraphs 17-22 and 49 of this Complaint.

121.   To state a claim for fraud under Georgia law, a party must allege: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." O.C.G.A. § 51-6-2; *ReMax North Atlanta v. Clark*, 244 Ga. App. 890, 893 (2000).

122.   A claim of fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other condition of a person's mind may be alleged generally." To state a fraud claim with particularity, a plaintiff must allege (1) the precise statements, documents, misrepresentations, or omissions made; (2) the time, place, and person responsible for the statement or omission; (3) the content and manner in which these statements misled the plaintiff; and (4) what the defendant gained by

the alleged fraud. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir. 1997).

123.   Upon information and believe, Defendants intentionally made false representations to SWE to induce SWE to pay the Defendants for services that they did not perform or for services performed by the Third-Party Coders and Service Providers in an amount greater than the Third-Party Coders and Service Providers actually charged.

124.   In the Agreement between the Parties, Mr. Estrin represented that SWE would be invoiced for the cost of the services performed by the Third-Party Coders and Service Providers in an amount equal to what the Third-Party Coders and Service Providers actually charged. This representation was made both orally from the time the Parties entered into the Agreement and again in an email where Mr. Estrin states that he has been grossly undercharging SWE for his services and he will begin charging a "significantly higher amount." This email from Mr. Estrin is attached as Exhibit K.

125.   As shown in Exhibit G, between November 7, 2016 and February 4, 2020, the Defendants made false representations to SWE by intentionally submitting monthly invoices that falsely represented the cost of Gillissa's "CSE extract" service as $300 a month.

126.   Each false monthly invoice constituted a separate misrepresentation to SWE by Defendants on the dates shown on each such invoice. Such invoices were delivered by wire as contemplated by federal law.

127.   However, as shown in Exhibit H, Gillissa conveyed to SWE that the cost of its "CSE extract" services was $200 a month, much lower than reflected on Defendants' invoices to SWE.

128.   Over the span of at least three years, the Defendants intentionally made these false representations to SWE by submitting monthly invoices that falsely represented the cost of Gillissa's services to induce a higher payment from SWE, which was retained by Defendants.

129.   Upon information and belief, discovery of the Defendants and third parties will reveal systematic overcharging for the services of the Third-Party Coders and Service Providers in direct contravention of the repeated misrepresentations made by Defendants.

130.   SWE relied on these representations and paid the fraudulent invoices based upon the reasonable belief that the Defendants' invoices reflected the actual cost of Gillissa's services.

131.  SWE justifiably and detrimentally relied on Defendants' misrepresentations with respect to the amount due for actual services provided by Gillissa.

132.  Defendants acted willfully and intentionally to deceive and induce SWE to rely on the Defendants' misrepresentations.

133.  As a result, SWE suffered damages in the amount of at least $3,800. Plaintiff reserves the right to amend this estimated amount of monetary damages after further discovery into Defendants' fraudulent activities, including fraudulent enhancement of charges by other Third-Party Coders and Service Providers.

## COUNT IX
## EQUITABLE ACCOUNTING
## Under O.C.G.A. § 53-12-232

134.  SWE incorporates by reference the allegations of Paragraphs 120-133 of this Complaint.

135.  Due to the inflation of the invoicing of Third-Party Coders and Service Providers, SWE's damages cannot be ascertained without an equitable accounting and SWE is without an adequate remedy at law as to its claims of the proper amounts due to it.

136.  An equitable accounting is appropriate because in this instance there were mutual accounts growing out of privity of contract (Defendants contracted

independently with the Third-Party Coders and Service Providers representing that they were merely passing through the costs incurred to the Third-Party Coders and Service Providers but refusing to provide the invoices from the Third-Party Coders and Service Providers) and the accounts are complicated (there were multiple Third-Party Coders and Service Providers who were providing services for a number of Defendants' customers and it is necessary to review and compare the invoices of Third-Party Coders and Service Providers to the various invoices Defendants provided to its various customers to ensure that the services of the Third-Party Coders and Service Providers were not being duplicated on charges to Defendants' customers). *See Arthur Tufts Co. v. Dejarnette Supply Co.*, 158 Ga. 85, 85, (1924), 1924 Ga. LEXIS 85, *8 (Supreme Court of Georgia, April 18, 1924).

137.   "An accounting may be had where one party is under an obligation to pay money to another based upon facts records which are known and kept exclusively by the party to whom the obligation is owed, or where there is a confidential or fiduciary relation between the parties." *Jones Creek Investors, LLC v. Columbia Cnty.*, 2017 U.S. Dist. LEXIS 35939, *4 (S.D. Ga. March 13, 2017), *quoting P.V. Props., Inc. v. Rock Creek ViII. Assocs. Ltd. P'ship*, 77 Md. App. 77, 549 A.2d 403, 409 (Md. Ct. Spec. App. 1998).

138.   The Defendants were under a contractual obligation to only charge SWE the precise amount Defendants' paid to Third-Party Coders and Service Providers for work done on the Initial Website.

139.   Defendants were in sole and exclusive control of the invoices received from those Third-Party Coders and Service Providers.

140.   Due to the Defendants' fraud, as revealed by Defendants false invoicing of services performed by Gillissa at 50% more than the amount actually charged by Gillissa, an equitable accounting is necessary to determine if the invoicing of other Third-Party Coders and Service Providers has been similarly falsely enhanced.

141.   An equitable accounting is necessary to determine whether or not Defendants have fraudulently charged multiple customers for the services of Third-Party Coders and Service Providers by effectively duplicating and potentially enhancing invoice charges from Third-Party Coders and Service Providers to more than one customer.

142.   SWE should be awarded any and all excess funds paid to Defendants established to be inappropriate by the equitable accounting performed in accordance with this Count.

**COUNT X**
**PUNITIVE DAMAGES**
**Under O.C.G.A. § 51-12-51**

143.   SWE incorporates by reference the allegations of Paragraphs 14-22, 26-33, 46-53, 76-80, 85-86, 90, 116-119, 123-133, and 135-140 of this Complaint.

144.   Under Georgia law, punitive damages may be awarded only in tort cases in which it is proven by clear and convincing evidence that such tortious actions were willful, malicious, fraudulent, wanton, oppressive, or that the entire want of care would raise the presumption of conscious indifference to consequences. O.C.G.A. § 51-12-51 (b).

145.   The Defendants acted willfully, maliciously, fraudulently, wantonly, oppressively, or with entire want of care that would raise a presumption of conscious indifference to any consequences when the Defendants began threatening copyright infringement litigation even though Defendants have not specifically referenced which parts of the New Website are allegedly infringing on the Alleged Works.

146.   The Defendants acted purposefully to exploit SWE, disrupt SWE's business, and coerce SWE into an extortion payment based on bullying tactics as set forth above.

147.   SWE should be awarded punitive damages for Defendants' malicious threats of litigation, tortious interference with M16 and Gillissa, libelous statements about SWE to M16, Gillissa, and Microsoft Azure, and based on Defendants' fraud.

## COUNT XI
### ATTORNEY'S FEES AND COSTS
### Under O.C.G.A. § 13-6-11

148.   SWE incorporates by reference the allegations of Paragraphs 1 through 147 of this Complaint.

149.   Under Georgia law, a jury may allow an award of attorney's fees if the party seeking the award has specially pleaded such an award and the party from whom attorney's fees are sought has acted in bad faith, been stubbornly litigious, or caused unnecessary trouble and expense. O.C.G.A. § 13-6-11.

150.   SWE has been forced to hire legal counsel and incur substantial attorney's fees and costs as a result of the Defendants' bad faith and stubbornly litigious conduct as set forth above.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the Court to enter judgment in its favor and grant Plaintiff the following relief:

A. Pursuant to 28 U.S.C. §§ 2201 and 2202, a declaration that SWE is not infringing on the Defendants' copyrights in the Alleged Works on the New Website;

B. Pursuant to 28 U.S.C. §§ 2201 and 2202, a declaration that Defendants do not own any valid copyrights in the Alleged Works;

C. Pursuant to 28 U.S.C. § 2202, such other and further relief, at law and in equity, to which SWE may be entitled;

D. Pursuant to 28 U.S.C. §§ 2201 and 2202, a declaration that Plaintiff holds a valid, irrevocable, unlimited implied license in the Alleged Works;

E. A permanent injunction enjoining Defendants from alleging copyright infringement in the Alleged Works against Plaintiff and enjoining Defendants from making any infringement claims to any third-parties relating to the Alleged Works;

F. An equitable accounting of all payments that Defendants received from SWE including all invoices sent to all of Defendants' clients for Third-Party Coder services and the granting of judgment for any overpayments made by Plaintiff as shown by that accounting;

G. An award of damages in favor of the Plaintiff for damages arising out of Defendants' breach of the Agreement;

H.  An award of damages in favor of the Plaintiff for damages arising out of Defendants' breach of the implied warranty of fitness;

I.  An award of damages in favor of the Plaintiff for damages arising out of Defendants' breach of the implied covenant of good faith and fair dealing;

J.  An award of damages in favor of the Plaintiff for damages arising out of Defendants' tortious interference with the Plaintiffs' business relations;

K.  An award of damages in favor of the Plaintiff for damages arising out of Defendants' libelous statements about the Plaintiff;

L.  An award of damages in favor of the Plaintiff for damages arising out of Defendants' deceptive trade practice in violation of O.C.G.A. § 10-7-372(a);

M. An award of damages in favor of the Plaintiff for damages arising out of Defendants' fraudulent invoices;

N.  An award of punitive damages in favor of the Plaintiff for damages arising out of Defendants' malicious conduct and fraud;

O.  An award of Plaintiff's attorney's fees and costs arising out of Defendants' malicious conduct.

P.  Such further relief as the Court deems proper.

Respectfully submitted this 22nd day of September, 2020.

**/Marcy L. Sperry/**
Marcy L. Sperry, Esq.
Georgia Bar No. 455561
marcy@vividip.com
Alex J. Aron, Esq.
Georgia Bar No. 162408
alex@vividip.com
Melissa F. Castro, Esq.
Georgia Bar No. 384781
melissa@vividip.com
Sperry IP Law d/b/a Vivid IP
3017 Bolling Way, NE
Atlanta, Georgia 30305
(404) 474-1600

Kirk W. Watkins
Georgia Bar No. 740550
Kwatkins@dzkl.com
Davis, Zipperman, Kirschenbaum,
& Lotito, L.P.
918 Ponce de Leon Avenue
Atlanta, Georgia 30306
(404) 688-2000

*Attorneys for Plaintiff*

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Civil Rules of Procedure, Plaintiffs request a trial by jury in this matter.

Respectfully submitted this 22nd day of September, 2020.

<u>**/Marcy L. Sperry/**</u>
Marcy L. Sperry, Esq.
Georgia Bar No. 455561
marcy@vividip.com
Alex J. Aron, Esq.
Georgia Bar No. 162408
alex@vividip.com
Melissa F. Castro, Esq.
Georgia Bar No. 384781
melissa@vividip.com
Sperry IP Law d/b/a Vivid IP
3017 Bolling Way, NE
Atlanta, Georgia 30305
(404) 474-1600

Kirk W. Watkins
Georgia Bar No. 740550
Kwatkins@dzkl.com
Davis, Zipperman, Kirschenbaum,
& Lotito, L.P.
918 Ponce de Leon Avenue
Atlanta, Georgia 30306
(404) 688-2000

*Attorneys for Plaintiff*

## <u>CERTIFICATION UNDER LOCAL RULE 7.1(d)</u>

Pursuant to Local Rule 7.1(d), the undersigned hereby certifies that the foregoing filing is a computer-generated document, prepared in Times New Roman, 14-point font, in accordance with Local Rule 5.1(c).

Respectfully submitted this 22nd day of September, 2020.

**/Marcy L. Sperry/**
Marcy L. Sperry, Esq.
Georgia Bar No. 455561
marcy@vividip.com
Alex J. Aron, Esq.
Georgia Bar No. 162408
alex@vividip.com
Melissa F. Castro, Esq.
Georgia Bar No. 384781
melissa@vividip.com
Sperry IP Law d/b/a Vivid IP
3017 Bolling Way, NE
Atlanta, Georgia 30305
(404) 474-1600

Kirk W. Watkins
Georgia Bar No. 740550
Kwatkins@dzkl.com
Davis, Zipperman, Kirschenbaum,
& Lotito, L.P.
918 Ponce de Leon Avenue
Atlanta, Georgia 30306
(404) 688-2000

*Attorneys for Plaintiff*
